**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT DEVINE,** | : | **CIVIL ACTION** |
| Petitioner, | : | |
| v. | : | |
| | : | |
| **KENNETH CAMERON,** | : | |
| **Superintendent,** *et al.*, | : | |
| Respondents. | : | **No.  09-171** |

**MEMORANDUM**

Pratter, J.                                                    August 25, 2015

Robert Devine, through counsel, has filed lengthy objections to both Magistrate Judge

Linda K. Caracappa's Report and Recommendation regarding his Petition for Writ of Habeas

Corpus, filed pursuant to 28 U.S.C. § 2254, and Magistrate Judge Caracappa's Order granting in

part and denying in part Mr. Devine's discovery motion.  After Respondents addressed Mr.

Devine's objections, Mr. Devine filed a motion to strike portions of Respondents' reply and prior

pleadings that were not part of the state court record, and Respondents opposed that motion.[1]  All

of these matters are now ripe for review by this Court.  For the reasons discussed below, the

Court overrules Mr. Devine's objections, adopts Magistrate Judge Caracappa's Report and

Recommendation and discovery order, and denies as moot Mr. Devine's motion to strike.

**BACKGROUND**

The facts of this case have been set forth numerous times throughout Mr. Devine's post-

trial proceedings, both here and in state court.  Briefly stated, Mr. Devine was convicted of

brutally raping Regina Jeffries in 1993 and Rita Walker in 1997.  Because the two rapes both

involved the use of a tree branch in the course of the attack, the cases were consolidated, and Mr.

---

[1] Mr. Devine also filed a notice of supplemental authority, to which Respondents did not reply.
The Court will discuss that supplemental authority in addressing Mr. Devine's objections to the Report
and Recommendation.

Devine was tried for both attacks in one trial.  Mr. Devine was convicted by a jury on February 6, 2002 of two counts of rape and involuntary deviate sexual intercourse and one count of aggravated assault.  Mr. Devine was represented by Gerald Stein at trial.  Prior to sentencing, Mr. Stein withdrew, and David Rudovsky filed a post-trial motion on Mr. Devine's behalf.  That motion was denied, and Mr. Devine was sentenced to 50 to 100 years imprisonment.

Mr. Devine then appealed to the Pennsylvania Superior Court, which affirmed the judgment of sentence.  The Pennsylvania Supreme Court denied Mr. Devine's petition for allowance of appeal.  On December 8, 2005, present counsel Leonard Sosnov filed a petition pursuant to the Post Conviction Relief Act ("PCRA") on Mr. Devine's behalf.  On August 30, 2006, Mr. Devine amended that petition and moved for DNA testing.  Both the petition and the motion were denied on March 8, 2007.  Mr. Devine then appealed the PCRA court's decision; the Pennsylvania Superior Court affirmed the PCRA court's decision, and the Pennsylvania Supreme Court denied allocator.

Mr. Devine then filed two suits in federal court.  In the first, he claimed that, in violation of 42 U.S.C. § 1983, he was denied Due Process when the City of Philadelphia refused him access to evidence for DNA testing.[2]  The second was the instant habeas proceeding, in which Mr. Devine raises four claims:  (1) violation of the right to assistance of counsel by the trial court, (2) ineffective assistance of trial counsel, (3) violation of due process in refusing access to seized beer cans for post-conviction DNA testing, and (4) violation of due process rights in failing to disclose a victim's criminal record at the time of trial.  In her Report and Recommendation, Magistrate Judge Caracappa denied each of Mr. Devine's claims for relief.  Also in this habeas proceeding, Mr. Devine moved for discovery, seeking access to certain

---

[2] The § 1983 case was placed in suspense after limited DNA testing was ordered by the state court in April, 2009, and it remains in suspense while this matter is pending.

evidence for DNA testing, among other things.  That motion was granted in part and denied in part.

Mr. Devine filed objections to both Magistrate Judge Caracappa's Report and Recommendation and her Order denying in part his motion for discovery.  He also filed a motion to strike portions of Respondents' reply and prior pleadings that were not part of the state court record.  Respondents have responded to both the objections and the motion to strike.

LEGAL STANDARD

Pursuant to 28 U.S.C. § 636(b)(1)(B) and local rules of court, a district judge may designate a magistrate judge to file proposed findings and recommendations in regard to a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  "Within fourteen days after being served with a copy [of the magistrate's report], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."  28 U.S.C. § 636(b)(1).  The district judge "shall [then] make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  [The] judge . . . may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989).  "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper." *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)).  The Third Circuit has "assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court." *Henderson v. Carlson*, 812 F.2d 874, 878 (3d Cir. 1987).

Section 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA") states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . ." *Cullen v. Pinholster,* 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011) (internal quotation and citation omitted). To determine whether a state court decision is contrary to clearly established law, "a federal court must consider whether the decision applies a rule that contradicts [such] law and how the decision confronts [the] set of facts that were before the state court." *Id.* at 1399 (internal quotation omitted).  A state court decision is "contrary to [ ] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams v. Taylor,* 529 U.S. 362, 405 (2000), or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," *id.* at 406.  "If the state court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case." *Cullen,* 131 S.Ct. at 1399 (internal quotation omitted).

As to discovery requests, under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." The Supreme Court has explained that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

**DISCUSSION**

A.  Discovery

In the course of this proceeding, Mr. Devine moved for discovery of several categories of evidence, including the DNA testing of Budweiser and Olde English beer cans recovered from the scene of the rape of Ms. Walker.  Mr. Devine objects to Magistrate Judge Caracappa's denial of DNA testing of the beer cans.  He argues that he has established good cause for allowing the discovery because the results of the DNA test could allow him to prevail on the prejudice prong of his DNA testing-related ineffective assistance claim, and he contends that Magistrate Judge Caracappa used the wrong standard in evaluating whether he was entitled to this discovery.

There is no dispute that the cans were not recovered from the scene until several days after the rape, and that the cans, sitting out in the open, were then exposed to torrential downpours.[3]  What is disputed is the cans' connection to Mr. Devine's case.  In addition to the state court record, Respondents point to other documentary evidence that they argue shows that these particular beer cans have no established connection to Mr. Devine's case.  Mr. Devine has moved to strike this evidence, but even without it, the record itself raises serious questions about the potential relevance of the cans.

---

[3] The parties do, of course, dispute the *significance* of these facts.

5

Mr. Devine relies primarily on the Pennsylvania Superior Court's memorandum affirming the denial of Mr. Devine's motion for DNA testing and his PCRA petition to argue for a connection between the cans and his case.  In that opinion, the court stated that the rapist approached Ms. Walker "with a six pack of beer in his hand," and that he "drank his beer" at the spot where he attacked her.  *Commonwealth v. Devine*, Nos. 927 & 1312 EDA 2007, at 2 (Pa. Super. Ct. Jan. 3, 2007).  How the Pennsylvania Superior Court came to this conclusion is unclear – the record does not appear to include testimony or other evidentiary support for the idea that the rapist approached Ms. Walker "with a six pack of beer in his hand."  Indeed, the lower court noted in *its* opinion that "[t]here was conflicting evidence as to whether the perpetrator drank [from] the beer cans."  *Commonwealth v. Devine*, C.P. No. 9706-0977, 9707-0065, at 14 n.6 (Pa. Comm. Pl. May 15, 2007).

At a hearing on June 26, 1997, Ms. Walker testified at one point that the perpetrator drank beer, but did not identify a brand or even a type of container – she said that *she* drank a small (nip-sized) *bottle* of beer at some point prior to the rape, but was not specific about what, if anything, the perpetrator consumed.  N.T. 6/26/97 at 30-33.  Later, at trial, Ms. Walker testified that there was no alcohol involved in the incident at all and that she did not recall telling the police that the perpetrator drank beer.  N.T. 2/4/02 at 106-09.  Also at trial, an investigating officer testified that the empty beer cans were found at the crime scene near a pair of shorts belonging to Ms. Walker, but that the officer could not recall clearly what Ms. Walker had said about beer.  The officer did not mention a brand of beer in her testimony.  *Id.* at 173-182.  The officer also confirmed that there was no mention of beer in the police report recording Ms. Walker's statement, although beer was mentioned in an investigation report.  *Id.* at 175-76.  Another officer's testimony explained why he retrieved beer cans from the scene of the crime – a

trash-strewn wooded area across from a mini-mart and near a railroad bridge: "I kind of remember hearing something about somebody drinking beer, and that was the beer that I saw there . . . I remember hearing something about some people drinking beer on the railroad tracks prior to this incident. Who said it, I just don't remember." N.T. 2/5/02 at 84-85.

In her order on Mr. Devine's discovery motion, Magistrate Judge Caracappa noted that "any DNA results [from testing of the beer cans] are not likely to indicate petitioner's innocence" because of the lack of connection between the beer cans and the evidence presented in the case and denied the request because "it fails to meet the threshold test for relevance." October 28, 2010 Order, Docket No. 38. In discussing the issue again in her Report and Recommendation, Magistrate Judge Caracappa emphasized that even if a third party's saliva was found on the beer cans, the "lack of clarity as to what petitioner was drinking, coupled with the fact that the cans lay in the woods for days following the attack, if they were the exact cans from which petitioner drank, casts significant doubt on any genetic material that could be obtained from them." November 30, 2011 Report & Recommendation, Docket No. 55, at 33-34.

Before addressing the merits of Mr. Devine's discovery request, the Court will look at the standard Magistrate Judge Caracappa used in evaluating it. Mr. Devine argues Magistrate Judge Caracappa held him to a higher standard than required by insisting that he show that the requested discovery could indicate his innocence. Petitioner claims that, instead, he only needed to show that "if he was excluded as the source of DNA on the beer cans, considered cumulatively with counsel's other mistakes, that result would create a reasonable probability that the outcome of the trial would have been different." Obj. to R&R, Docket No. 58, at 9. Respondents counter that the correct standard was employed.

Magistrate Judge Caracappa was not precise in her October 28, 2010 Order as to the standard she was employing in evaluating Mr. Devine's discovery requests.  Her mention of the likelihood of test results proving Mr. Devine's innocence could signal that she was employing a higher bar than the Supreme Court has set for establishing good cause for discovery in habeas matters (*i.e.*, that she was requiring the Petitioner to show that the evidence, if favorable, could prove him entirely innocent of the crimes, not just that it could show that he "may . . . be able to demonstrate that he is entitled to relief" should the evidence be favorable).  However, the same statement could also be interpreted, as Respondents urge, as indicating that Magistrate Judge Caracappa believed that the evidence could not possibly be interpreted as *tending to support* Mr. Devine's innocence such that it would raise a reasonable likelihood of a different result in the underlying case, even if the results were what he was hoping they would be.  This latter interpretation makes more sense when coupled with Magistrate Judge Caracappa's later statement that the evidence, even in the best case scenario, would not even be relevant.  Thus, the Court agrees with Respondents that the correct standard was employed.

Going beyond the standard employed to the heart of Mr. Devine's objection, the Court agrees that even if DNA testing showed the presence of saliva or other genetic material belonging to an individual other than Mr. Devine, such a result would not amount to evidence in Mr. Devine's favor, let alone evidence that would, alone or in combination with what Mr. Devine would perceive to be an error-free trial, create a reasonable likelihood of producing a different result at trial.  The supposed connection between the beer cans and Ms. Walker's rape is, at most, quite tenuous.  Coupled with the passage of time between the crime and the collection of the cans, DNA results showing the presence of a third party's genetic material would be, at best, a neutral result.

The cases Mr. Devine cites are distinguishable.  For instance, in *Commonwealth v. Moto*, 23 A.3d 989 (Pa. 2011), the Pennsylvania Supreme Court dealt with an issue entirely different from whether to grant DNA testing as an initial matter or who should weigh evidence of potentially exculpatory DNA results and alternative explanations for its presence.  In *Moto*, the court had before it the question of whether to expunge a criminal record when a defendant had been granted a new trial and the Commonwealth declined to re-try him because it was unable to locate the victim.  Thus, although the case discusses the issue of DNA testing at an earlier stage of the proceedings, the question of DNA discovery was not before the *Moto* court.  Even if the issue of discovery of DNA evidence had been squarely before that court, in *Moto*, the facts were dramatically different from those at issue here.  In that case, the defendant was granted a new trial because DNA testing of the panties worn by the victim on the night of her assault revealed the DNA of three men, and none of it matched the defendant.  *Id.* at 991.  Thus, the samples tested in that case came from a piece of clothing with an unmistakable connection to the crime, making the results highly probative of the defendant's guilt or innocence.  There was no mention of a chain of custody issue, or of any doubt that that particular clothing was worn by the victim on the night in question, or, indeed, of any other similar concerns casting doubt upon the very relevance of that DNA evidence.  That is not the case here, where the items to be tested have no established link to the crime and were left unattended for several days after the crime before collection.

For these reasons, the Court will not overturn Magistrate Judge Caracappa's denial of Mr. Devine's discovery motion with respect to DNA testing of the beer cans.  For the same reasons, to the extent that Mr. Devine also objects to the portions of Magistrate Judge Caracappa's Report

and Recommendation denying his substantive claims related to DNA testing of the beer cans,[4] the Court will approve and adopt those portions of Magistrate Judge Caracappa's Report and Recommendation.

### B.  Merits

#### 1.  Jury Note

During deliberations, the jury requested "Photos and Mug Shots of defendant." Because counsel previously agreed that the trial court did not need to consult them before responding to jury requests for photo array exhibits, Mr. Stein was never informed of this request.  Mr. Devine argues that the use of the phrase "Mug Shots" by the jury shows that they believed he had a prior criminal record, when Mr. Devine's previous criminal record was not properly before the jury.  He claims that the trial court's failure to alert counsel of this issue prevented counsel from taking corrective action and effectively deprived him of the assistance of counsel.

Magistrate Judge Caracappa held that this claim was properly exhausted in state court, that under the facts of this case the alleged deprivation of counsel did not arise at a critical stage of the trial, and that even if the trial court erred in not informing counsel of the note, Mr. Devine was not prejudiced by that error.  Mr. Devine argues that because the state court decided this issue entirely on the basis of state law it is subject to *de novo* review, that the issue *did* arise at a critical stage of the trial as outlined in *United States v. Cronic*, 466 U.S. 468 (1984), making a discussion of prejudice irrelevant, and that, even if the Court must consider prejudice, it *was*

---

[4] Mr. Devine raised a claim of ineffective assistance based in part on trial counsel's failure to pursue DNA testing of the beer cans.  Given the lack of relevance of the beer cans to his case, as outlined above, even the presence of a third party's DNA on the cans would not support a finding of prejudice sufficient for this Court to conclude that his right to the effective assistance of counsel had been violated. For the same reasons, a similar fate must befall Mr. Devine's claim that his due process rights were violated by the denial of DNA testing of the beer cans.

prejudicial to allow the jury to believe that Mr. Devine had a criminal record when that fact was not properly in evidence.

The Sixth Amendment guarantees effective assistance of counsel to every criminal defendant.  U.S. Const., amend. VI.  When evaluating Sixth Amendment claims, courts generally follow the *Strickland* test, which looks both at whether "counsel's representation fell below an objective standard of reasonableness" and whether "there is a reasonably probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  However, if a defendant is completely deprived of counsel at a critical stage of the criminal proceeding, a defendant need not show prejudice, and reversal is required.  *United States v. Cronic*, 466 U.S. 648, 658-59 (1984).

The Court thus begins by examining whether the alleged deprivation occurred at a critical stage of trial.  The Court agrees with Magistrate Judge Caracappa that *United States v. Toliver*, 330 F.3d 607 (3d Cir. 2003), governs the matter at hand.  In that case, the Third Circuit Court of Appeals applied *Cronic* and held that although the defendant's constitutional rights were violated when the trial judge failed to consult with counsel before sending portions of trial transcripts back to the jury in response to their question, that failure did not occur at a critical stage of the trial.  *Id.* at 614-15.  The court contrasted that situation, in which the judge only provided testimony already heard by the jury, to the situation in other cases, in which judges *sua sponte* instructed juries without consulting with attorneys and in which courts found that the exchange between judge and jury constituted a critical stage of the trial for Sixth Amendment purposes. *Id.*  Because the *Toliver* court concluded that a critical stage of trial was not implicated, it went on to assess prejudice, and determined there was none under the circumstances.  *Id.* at 617.

This case is much more akin to *Toliver* than to those cases distinguished by the *Toliver* court, in which the judge passed new information on to the jury.  As in *Toliver*, the jury here requested a portion of the record in the case to review in aid of deliberations, and the court provided it.  Unlike in *Toliver*, however, the attorneys had already agreed that the jury could see those particular exhibits if they requested to do so.  Thus, here, the Court cannot say that the trial court erred in providing them without consulting counsel.  That the words "mug shots" were used by the jury does not change the fact that the jury asked for a specific piece of evidence, one that the parties had already discussed providing to the jury, and the trial court supplied that evidence, as previously agreed by the parties, without commentary.

Even assuming the trial court did err in failing to consult counsel because of the jury's use of the words "mug shots" in its note, that error was harmless.  As Magistrate Judge Caracappa correctly stated, "where the trial court made a constitutional error, the prejudicial impact of the error is evaluated according to whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *See* R&R, at 12, Docket No. 55 (quoting *Fry v. Pliler*, 5512 U.S. 112, 127 S.Ct. 2321 (2007)).  The jury did not ask questions about Mr. Devine's criminal record when it used the term "mug shots."  Rather, as Magistrate Judge Caracappa noted, in requesting photo arrays, the jury demonstrated a focus on the main issue at trial, which was the identification of Mr. Devine as the rapist by the two victims, not a focus on his criminal record as Petitioner would have the Court believe.  Indeed, the use of the term "mug shots" seems merely incidental to the jury's actual intentions in requesting the photographs.  It is common sense that the average juror would be much more likely to refer to pictures in the possession of law enforcement as "mug shots" than to use the more technical and unfamiliar term "photo array."  And as Respondents have previously pointed out, the photo arrays were

properly in evidence, and no objection to their admission was made, nor has Petitioner urged that his counsel's failure to object constituted ineffective assistance.[5]  Thus, the Court will not disturb the state court's denial of relief on this ground.

      2.   Ineffective Assistance

Each of the following ineffective assistance claims is governed by the familiar standard set forth in *Strickland*.  The *Strickland* test has two components.  The first is inadequate performance by counsel.  To meet this prong, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  The second is prejudice flowing from the inadequate performance.  Analytically, even if counsel's performance falls below the applicable standard of care, the client cannot attain relief unless the client also shows that counsel's unprofessional errors actually visited some palpable prejudice on the defense.  *Strickland*, 466 U.S. at 687.  With the burden to establish the requisite prejudice, the defendant must show that the error(s) had some identifiable effect on the outcome of the proceeding to the client's detriment.  Stated otherwise, the client is obliged to show that "but for" the defense lawyer's errors the outcome would have been different, *i.e.*, less unfavorable to the defendant.  *Id.*[6]

_____

[5] Moreover, it has long been accepted that photo arrays are admissible if their probative value outweighs any potential prejudice, and courts acknowledge that the potential prejudice is that a jury may infer from police possession of a defendant's photograph that the defendant had prior brushes with the law. *Government of Virgin Islands v. Petersen*, 507 F.2d 898, 902 (3d Cir. 1975) (the Third Circuit Court of Appeals has on multiple occasions "allowed reference to pretrial photographic identifications to buttress in-court identifications over objections that such references would allow the jury to believe that the pretrial identifications were from police mug shots and thus infer that the defendants had engaged in prior criminal activity").  It is hardly shocking, then, that a jury did make the very inference that courts have long recognized they will make when presented with police photo arrays.  Given that the risk of this inference is clearly deemed by courts to be an acceptable risk when admitting photo arrays, the Court is not moved to grant habeas relief on the basis of the potential realization of that acceptable risk.

[6] Petitioner insists that the issue of prejudice must be viewed cumulatively.  The Court need not address any issues of cumulative prejudice, however, as there has been no finding that trial counsel acted unreasonably.

The Court must be "highly deferential" in evaluating counsel's conduct.  *Id*. at 689.  The Supreme Court has admonished lower courts to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," noting that this requires courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*.  This is all the more true when evaluating *Strickland* under the strictures of § 2254(d).  As the Supreme Court has noted:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011).  It is within this framework that the Court evaluates the following claims of ineffective assistance.

### a.   Failure to Cross-Examine Ms. Jeffries with Evidence of Bias

Mr. Devine argues that his trial counsel's failure to get an updated criminal record for Ms. Jeffries and to then use that record (which, at the time of trial included convictions for prostitution and drug offenses, as well as her probationary status) to impeach her.  Magistrate Judge Caracappa found that trial counsel's failure to cross-examine Ms. Jeffries using that information did not constitute ineffective assistance.

As the state courts found, Ms. Jeffries's convictions could not have been used for impeachment purposes, as her prostitution and drug offenses were not *crimen falsi* crimes.  *See*

Pa. R. Evid. 609.[7]  The Commonwealth does allow impeachment evidence when it concerns a witness's probationary status because it is pending, rather than final.  *See Com. v. Evans*, 512 A.2d 626, 631-32 (1986) ("[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury.").  Certainly, then, trial counsel should have obtained this information, as it was publicly available and provided potential grounds for impeachment, and, as the many cases cited by Petitioner show, he had a right to use that information.

The inquiry does not end, there, however, as there is a distinct difference between finding that there was a *right* to use certain evidence and finding that counsel had a *duty* to use that evidence.  Petitioner argues that because trial counsel cross-examined Ms. Walker about her open probation status, he would have done the same had he had the same information about Ms. Jeffries.  But that conclusion does not necessarily follow, given the facts of the case.  While undermining the credibility of the only two witnesses to the crimes was important, so too was keeping the jury from giving in to sympathy for the two victims of indisputably heinous attacks.  As Magistrate Judge Caracappa points out, trial counsel had a difficult task in cross-examining two rape victims and needed to walk the fine line between effectively raising doubts as to credibility and overly aggressive victim-shaming.  A reasonable lawyer could have chosen the strategy of impeaching one, but not both, of the victims with criminal history information.  That trial counsel *did* choose to cross-examine Ms. Walker with similar impeachment evidence and that Mr. Devine was *still* convicted further suggests that the jury was undeterred by such impeachment evidence.

---

[7] Mr. Devine persists in arguing that the prostitution convictions were admissible.  However, as that is not a question of federal law and the state courts have already ruled on that issue, the Court will not revisit it here.

Mr. Devine brought to the Court's attention supplemental authority that he offers in support of this claim.  In *Grant v. Lockett*, 709 F.3d 224 (3d Cir. 2013), a habeas petitioner was convicted of murder based almost entirely on the testimony of one witness.  *Id.* at 236.  The petitioner's counsel did not investigate that star witness's criminal history, which meant that he did not know, and thus did not use for impeachment, the fact that the witness was on parole at all relevant periods in the case.  In assessing whether this prejudiced petitioner, the court looked at the particular circumstances of the case, which included a lack of any physical evidence linking the petitioner to the crime, physical evidence contradicting the star witness's testimony, contradictory evidence from witnesses in a much better position to view the crime, and a lack of any motive.  Moreover, in that case, the star witness was not a crime victim and had no apparent link to the criminal activity, apart from claiming to be a witness to it.  *Id.* at 237-38.  Based on all of this, the court concluded that prejudice did result from counsel's failure to investigate and then use the witness's parole status for impeachment.

That case, however, is different from the one here.  Although there is a similar lack of physical evidence, there were no witnesses testifying that someone other than Petitioner committed the crimes of which he was convicted, and certainly no witnesses in a better position to view the commission of the crimes testifying in contradiction to the victims.  Also, in *Grant*, the star witness was not a crime victim, which means that any evidence that might give insight into his motives for testifying would be especially probative.  Here, the very person Petitioner believes should have been more aggressively cross-examined was unquestionably the victim of a very brutal rape.  As noted above, cross-examining a crime victim, and in particular a victim of rape, is a much more nuanced and problematic task than cross-examining a totally unconnected and uninjured bystander.

Because the Court cannot say that a reasonable lawyer certainly would have used the impeachment evidence at issue *or* that the use of that evidence would have influenced the outcome of the trial, Mr. Devine is not entitled to habeas relief on this ground.

          b.   Failure to Object to Inadmissible Testimony that Petitioner had Prior Arrests

At trial, defense counsel failed to object when the following non-responsive testimony was elicited from Detective Young:

> Q.    So far as we know, these two people who are the complainants each looked at the defendant in two pictures; is that right?
> A.    No.
> Q.    No?
> A.    Ms. Walker looked at two pictures.  Two different pictures, one from 1993, one from 1997.
> Q.    But of the same man?
> A.    *Well, he's been arrested twice obviously.*
> Q.    Sir, the question is:  Of the same man; is that right?
> A.    That's correct.

(N.T. 2/5/02 at 102-03) (emphasis added).  Mr. Devine argues that this mention of prior arrests was prejudicial and that counsel should have objected and requested a mistrial or a cautionary instruction.  Trial counsel explained that he did not object because he did not want to draw attention to the testimony, and the state courts and Magistrate Judge Caracappa accepted this altogether conventional reasoning.

Despite Mr. Devine's protests, the Court cannot say that counsel's strategy was unreasonable.  The cases cited by Petitioner, which hold that implying that a defendant has a criminal history is reversible error, are inapposite, as Magistrate Judge Caracappa noted.  While it is true that counsel reasonably could have asked for and received a curative instruction if he had objected at the time of the testimony, doing so would have, as trial counsel explained, further called the jury's attention to that testimony, even if the request was made at sidebar and out of

the hearing of the jury, and that strategic decision distinguishes this case from those cited by

Petitioner.  Once again, the Court must distinguish between a right and a duty.[8]

      For all of these reasons, the Court finds that the state court did not err in dismissing this

claim.

### c.   Failure to Object to "Hearsay" Testimony

      On direct, Detective Young testified about how, while investigating the assault of Ms.

Walker, he learned of the 1993 assault of Ms. Jeffries.  More specifically, he testified that he

asked the Research and Planning department to look for similar crimes, and that through that

search he learned of another rape involving a tree branch – namely, the rape of Ms. Jeffries.

(N.T. 2/5/02, 74:7-75:10).  During direct examination, he did not testify that the assault of Ms.

Jeffries was the only similar rape, nor did he testify about the contents of any report he received

from Research and Planning (or even that he received a "report").  Then, on cross examination,

trial counsel explored the subject further, in an attempt to pick apart the detective's investigative

technique.  He elicited testimony that Detective Young received a report of some kind that

showed that in the span of approximately 1990 through 1997, there were five reported rapes

using a foreign object, including two in which "tree trunks" were inserted into the victim's

vagina, and one in which a stick was used.  (N.T. 2/5/02, 86:22-87:11).

      Petitioner argues that the testimony about the Research and Planning report was hearsay,

and that trial counsel was ineffective when he failed to object to the testimony on direct and

---

[8] Petitioner's point that the prejudice of this testimony was realized when the jury asked for "mug shots" is misplaced.  It does not follow that this one remark resulted in the jury concluding that the photos were mug shots – that is a conclusion that the jury easily could have come to just by knowing that the police had photographs of Mr. Devine in their possession.  Nor does it follow that the use of the term "mug shots" meant that the jury was in any way focused on Petitioner's criminal record, given that the term was used in a request for the photo arrays and viewing the photo arrays did nothing to reveal Petitioner's past crimes.  It is just as likely (and probably more so) that the jury simply used a colloquial term for pictures in the possession of the police, as discussed above.

when he elicited further testimony about the report on cross.  Furthermore, Mr. Devine argues

that his Confrontation Clause rights were violated by the introduction of the alleged hearsay.

The Pennsylvania Superior Court, however, found that the testimony was not hearsay, holding

that the evidence was not offered for the truth of the matter asserted, and the Report and

Recommendation held that it was bound by the Superior Court's holding.  Despite this, Petitioner

argues that the state court erred and failed to consider all of the testimony that he claims is

hearsay, and that less deference is due because the Pennsylvania Superior Court and not the

Pennsylvania Supreme Court decided the issue.[9]

First, Petitioner's protestations notwithstanding, the Pennsylvania Superior Court did cite

to the all of the testimony in question.  It specifically quoted the only testimony on the Research

and Planning report that described the actual *contents* of the so-called report, which occurred on

cross-examination.  Indeed, on direct examination, Detective Young did not mention receiving a

"report;" he stated that he asked Research and Planning about whether there were crimes similar

to the one committed against Ms. Walker and that he found a 1993 case involving Ms. Jeffries.

Thus, Petitioner's protests that the state court ignored the salient testimony or unreasonably

interpreted the facts when deciding the issue are meritless.

Even assuming the Pennsylvania courts erred in determining that the testimony discussed

above was hearsay, "[f]ederal courts reviewing habeas claims cannot 'reexamine state court

determinations on state-law questions.'"  *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004)

(quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).  In *Priester*, the habeas petitioner

complained that his counsel was ineffective for failing to object to certain jury instructions.  *Id.*

---

[9] As further evidence that the testimony in question was hearsay, Petitioner cites to an affidavit by former counsel and portions of a Commonwealth's brief in state court.  That former counsel and even the Government believed that the testimony was or may have been hearsay is of no moment, as the Court is bound only by the opinions of the state court on this matter, not by the arguments of lawyers.

at 401.  On state collateral review, the Pennsylvania Superior Court held that the instructions

comported with state law, and that therefore his counsel could not be found ineffective for failing

to object to unobjectionable instructions.  *Id.* at 402.  The Third Circuit Court of Appeals held

that it was bound by this determination of state law and that therefore the petitioner could not

"satisfy the first component of a viable ineffective assistance of counsel claim-that counsel's

performance was deficient."  *Id.*[10]

The same is true here – because the Pennsylvania Superior Court held that the testimony

in question was not hearsay and this Court is bound by that decision, Mr. Devine cannot make

out his claim of ineffectiveness.  As to his argument that the testimony violated the

Confrontation Clause, that claim fails because the Confrontation Clause does not apply to

testimony that is not hearsay.  *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("The

[Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than

establishing the truth of the matter asserted.").

d.   Failure to Request Missing Evidence Instruction

---

[10] Petitioner insists that the Superior Court's legal conclusion is not a binding construction of state law because it did not issue from Pennsylvania's highest court.  He attempts to distinguish *Priester* by arguing that the Third Circuit did not rely on the Superior Court, but rather found that the Superior Court's decision comported with the Pennsylvania Supreme Court's case law and only then declined to reconsider the issue of state law.  Obj. to R&R, Docket No. 58, at 26-27.  However, the fact that the *Priester* court bolstered its reliance on a Pennsylvania Superior Court's holding by also citing Pennsylvania Supreme Court cases that had similar holdings does not change the fact that the *Priester* court *was* yielding to an intermediate state appellate court's holding.  *Priester*, 382 F.3d at 402.

In *Estelle v. McGuire*, 502 U.S. 62 (1991), the case on which *Priester* relies, the Supreme Court "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," and did not limit that prohibition to only state court determinations made by the state's highest court.  *Estelle*, 502 U.S. at 67-68.  *See also, e.g., Rose v. Hodges*, 423 U.S. 19, 21-22 (1975) (yielding to Tennessee intermediate appellate court's interpretation of Tennessee state law).  Adopting Petitioner's view would utterly change the federal court's role in habeas proceedings, as state court collateral proceedings are very often not reviewed by the state's highest court.  Taking Petitioner's view, therefore, would open up a Pandora's box of state law questions for second-guessing by federal habeas courts each time a state's highest court declined to review a collateral proceeding.

Petitioner originally argued that his counsel was ineffective for failing to request a missing evidence instruction as to the loss of Ms. Jeffries's rape kit, as well as the alleged loss of semen swabs taken from Ms. Walker.  In his objections, he only challenges Magistrate Judge Caracappa's conclusions as to Ms. Jeffries's rape kit.[11]  Before addressing whether counsel's conduct in failing to request an adverse inference instruction regarding the missing rape kit fell short of the standards for counsel set forth in *Strickland*, the Court will first examine whether Petitioner was entitled to such an instruction.  If Petitioner was not even entitled to the instruction, it follows that counsel could not be deemed ineffective for failing to request it.

The Supreme Court of Pennsylvania has stated, "'where evidence which would properly be part of a case is within the control of the party in whose interest it would naturally be to produce it, and, without satisfactory explanation he fails to do so, the jury may draw an inference that it would be unfavorable to him.'"  *Clark v. Philadelphia Coll. of Osteopathic Med.*, 693 A.2d 202, 204 (Pa. Super. Ct. 1997) (quoting *Haas v. Kasnot*, 92 A.2d 171, 173 (Pa. 1952)).[12]  A party is not entitled to an adverse inference instruction when the non-requesting party lacked control of that evidence by the time of the trial.  In *Commonwealth v. Matt*, 441 A.2d 1239, 1241 (Pa. Super. Ct. 1982), for instance, the Court ruled that "a negative inference may be drawn from

---

[11] There is a great deal of confusion surrounding Ms. Walker's semen swabs, but it seems that the swabs mentioned in medical records were the same ones delivered to police and tested, leading to inconclusive results.  Thus, there were no "missing" swabs in Ms. Walker's case, despite misstatements by courts in Pennsylvania evaluating Mr. Devine's claims, and the Court will strike the portion of the Report and Recommendation that perpetuates this erroneous statement of fact.  Specifically, on page 30 of the Report and Recommendation, the Court strikes these two sentences:  "In his habeas petition, petitioner does not refute that the sample from Ms. Walker was lost. Indeed, petitioner says that the trial court 'reasonably concluded' the sample was lost."

[12] The majority of cases arising before the Superior Court of Pennsylvania addressing adverse inference instructions concern missing witnesses rather than evidence; however, the analysis for the instruction between the two – witnesses and evidence – is identical.  *See, e.g., Com. v. Matt*, 441 A.2d 1239 (Pa. Super. Ct. 1982); *Com. v. Gibson*, 369 A.2d 314 (1976); *see generally* 1 West's Pa. Prac., Evidence § 427 (4th ed.) ("Because liberal pretrial discovery reduces the likelihood that relevant documents or other tangible evidence will not be produced, issues related to the failure to produce evidence arise most frequently from the failure to call a witness.").

a party's failure to call a corroborating witness who was in his control," but that "[o]ne exception to this rule is where the witness is not available or not within control of the party against whom the negative inference is desired."  Indeed, lack of control of the evidence by the non-requesting party is included among the six exceptions to the availability of an adverse inference charge developed by Pennsylvania courts.  *See Com. v. Harley*, 418 A.2d 1354, 1357 (Pa. Super. Ct. 1980).

In this case, Petitioner was not entitled to an adverse inference instruction concerning the missing rape kit from Ms. Jeffries because there is nothing in the record to establish that police *ever* had control of the missing evidence.  The victim of the first rape, Ms. Jeffries, was treated at Jefferson Hospital, where a rape kit was assembled by the hospital staff.  The trial record indicates that the specimens were submitted, if anywhere, to the Department of Public Health Family Medical Care Services, Division of Maternal and Child Health, rather than to the police laboratory.  Petitioner's counsel, Mr. Stein, testified that the police had consistently told him that no evidence was available for the rape kit, and that he received a form from Jefferson Hospital that indicated that the kit was sent to the Department of Public Health.  The assigned investigator to the crime, Ms. Bilal, testified that she did not know what happened to the rape kit and had not been able to locate it.  No property receipt existed for the rape kit.  Because there is no evidence that the police ever had possession of the rape kit beyond inferences that could be drawn from general police procedure, the Superior Court's factual findings are not clearly erroneous.[13]  Thus,

---

[13] It is beyond dispute that at the time of the trial, the Commonwealth did not have control over Ms. Jeffries's rape kit and, by all accounts, had never seen the results (assuming there were any).  Even if a party can establish that the opposing party *once had* control of the evidence, the decision to instruct the jury on the inference lies within the trial court's discretion, and a request for an adverse inference instruction can be denied even if the evidence is lost immediately before trial.  In *Raskin v. Ford Motor Co.*, 837 A.2d 518, 520 (Pa. Super. Ct. 2003), a case involving tort claims against a car manufacturer, the plaintiff attempted to introduce an adverse inference instruction after the car company failed to produce the original driver's seat of the damaged vehicle.  There, the company admitted to once possessing the

Petitioner will not be granted habeas relief because his counsel cannot be considered ineffective for failing to request an adverse inference instruction when Petitioner was not entitled to such an instruction at trial.

   3. Commonwealth's Failure to Disclose the Updated Criminal Record of Ms. Jeffries

Petitioner argues that the Commonwealth violated his due process rights in failing to provide an updated version of Ms. Jeffries's criminal record immediately prior to trial.  In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates Due Process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In *Strickler v. Greene*, 527 U.S. 263 (1999), the Supreme Court refined the *Brady* rule:  "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Id.*  Petitioner is not entitled to habeas relief because while the nondisclosed evidence was arguably favorable, it was not suppressed by the Commonwealth, nor was it prejudicial.

Here, a portion of Ms. Jeffries's updated criminal record could have been used for impeachment purposes.  While prior convictions may not be used as impeachment evidence unless those convictions are *crimen falsi*, ruling out the use of Ms. Jeffries's prostitution

---

seat, but contended the evidence was "mislaid at the courthouse" during a separate trial.  *Id.*  The trial court found this explanation "satisfactory."  *Id.*  In turn, the Pennsylvania Superior Court found no "abuse of discretion in the trial court's evaluation of Ford's explanation."  *Id.*  Thus, even when a party is closely responsible for the loss of a vital piece of evidence, a sufficient explanation for its exclusion – that it was lost – may prevent an adverse inference instruction.  Even if Petitioner had established that police once controlled the rape kit and subsequently lost the results – much like in *Raskin* – such a conclusion would still likely not warrant an adverse inference instruction.

convictions as impeachment evidence,[14] her probationary status could have been used to impeach her, as discussed above.  *See* Section B.2.a., *supra*.  However, the Commonwealth's failure to update the defense regarding Ms. Jeffries's criminal record does not amount to suppression.

In *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991), the Third Circuit held that "*Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence."  *Id.*  Explaining, it stated, "evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."  *Id.*  Petitioner relies on *Wilson v. Beard*, 589 F.3d 651 (3d Cir. 2009).  In that case, prosecutors failed to disclose not only a prior *crimen falsi* conviction of a trial witness for impersonating a police officer that would have led to a trail of out-of-state convictions and mental health issues including memory impairments, but also another witness's mental health problems (which included being transported to the hospital by police for evaluation immediately after testifying at trial) and a third witness's receipt of interest-free loans from a police officer while acting as a police informant (information which directly contradicted trial testimony by that officer).  The *Wilson* court held that the Commonwealth violated *Brady* by not disclosing this information.

The case in *Wilson* is considerably different from this case.  Here, the prosecutor did alert Petitioner's trial counsel that Ms. Jeffries had a criminal history, and although an update was never offered, counsel could have obtained an updated criminal history with reasonable diligence, as even Petitioner argues when asserting an ineffectiveness claim.  Trial counsel

---

[14] Under Pennsylvania law, "a witness may not be impeached on the basis of convictions for crimes not involving dishonesty or false statement."  *Com. v. Williams*, 573 A.2d 536, 538 (Pa. 1990).  "[C]rimes such as rape, resisting arrest, *prostitution*, and assault with intent to kill are not crimes involving dishonesty or false statement."  *Com. v. Vitale*, 664 A.2d 999, 1003 (Pa. Super. Ct. 1995) (emphasis added).

undoubtedly knew the "essential facts" that would have enabled him to take advantage of the exculpatory evidence available.  Indeed, in *Grant*, 709 F.3d at 230-31, a case submitted by the Petitioner as supplemental authority in support of a different argument (*see* Section B.2.a., *infra*), the Third Circuit Court of Appeals held that because trial counsel could have discovered the criminal history of a key witness, which included three prior convictions and his parole status at the time of trial, through reasonable diligence, a habeas petitioner's due process rights were not violated when the Government failed to volunteer that information.  The reasoning in *Grant* is even more compelling here, as Mr. Devine's trial counsel was on notice that Ms. Jeffries had a criminal record, thanks to the Government's disclosures, and simply failed to update that information at the time of trial.  Thus, Mr. Devine is not entitled to habeas relief on this ground.

## CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's Objections to both the Report and Recommendation and Magistrate Judge Caracappa's Order granting in part and denying in part Mr. Devine's discovery motion.  An appropriate Order follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE